UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

United States of America,

     Plaintiff,

 vs.         REPORT AND
            RECOMMENDATION

(01) Bernard Vann,
   a/k/a "Mooch,"
(07) Angelo M. Castleman,
   a/k/a "Boo,"
(27) Antwon Bernard Williams,

      Defendants.    Crim. No. 07-247
(JMR/RLE)

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

I.  <u>Introduction</u>

This matter came before the undersigned United States Magistrate Judge

pursuant to a general assignment, made in accordance with the provisions of Title 28

U.S.C. §636(b)(1)(B), upon the following Motions of the Defendant Bernard Vann:

   1.  The Defendant's Motion to Suppress Any
       Identifications [Docket No. 618]; and

2.     The Defendant's Motion to Suppress Any Evidence
Obtained as a Result of Any Illegal Searches [Docket
No. 621].

A Hearing on the Motions was conducted on October 16, 2007, at which time, the

Defendant appeared personally, and by Thomas H. Shiah, Esq., and the Government

appeared by Christian S. Wilton, Assistant United States Attorney.[1]   For reasons

which follow, we recommend that each of the Defendant's Motions be denied.

II.  Factual Background

The Defendant is charged with one (1) Count of Conspiracy to Distribute a

Controlled Substance, in violation of Title 21 U.S.C. §§841(a)(1), 841(b)(1)(A), and

846; one (1) Count of Distribution of Cocaine Base, in violation of Title 21 U.S.C.

§§841(a)(1), and 841(b)(1)(B); and three (3) Counts of Distribution of Cocaine Base,

in violation of Title 21 U.S.C. §§841(a)(1), and 841(b)(1)(A), and Title 18 U.S.C. §2.

The events which gave rise to those charges are alleged to have taken place from

---

[1]We note that the Defendant Angelo M. Castleman ("Castleman") appeared
personally at the Hearing, and by Robert J. Kolstad, Esq.; and that the Defendant
Antwon Bernard Williams ("Williams") also appeared personally, and by Raymond A.
Wood, Esq.   At the Hearing, the Defendants Castleman and Williams formally
withdrew all of their Pretrial Motions.  We, therefore, recommend that the Motions of
Castleman [Docket Nos. 647 and 648], and of Williams [Docket No. 428], be denied
as moot.

December 1, 2005, through July 16, 2007, in this State and District.  As pertinent to those charges, and to the Motion now before us, the operative facts may be briefly summarized.[2]

At the Hearing, the Government proffered several Exhibits to the Court:  1) a Search Warrant and supporting Affidavit, which is dated July 20, 2007, along with an Inventory Return, dated July 31, 2007, which was filed in the United States District Court for the District of Minnesota ("Exhibit 1"), and was related to the search of the downstairs apartment (the "Downstairs Apartment") of a duplex (the "Duplex") in Duluth, Minnesota; 2) a Search Warrant and supporting Affidavit, dated July 20, 2007, along with an Inventory Return, dated July 31, 2007, which was filed in the United States District Court for the District of Minnesota ("Exhibit 2"), and was related to the

---

[2]Rule 12(d), Federal Rules of Criminal Procedure, provides that "[w]hen factual issues are involved in deciding a motion, the court must state its essential findings on the record."  See, United States v. Santiago, 410 F.3d 193, 198 (5th Cir. 2005), cert. denied, 126 S.Ct. 1565 (2006).  As augmented by our recitation of factual findings in our "Discussion," the essential factual findings, that are required by the Recommendations we make, are contained in this segment of our Opinion.  Of course, these factual findings are preliminary in nature, are confined solely to the Motions before the Court, and are subject to such future modification as the subsequent development of the facts and law may require.  See, United States v. Moore, 936 F.2d 287, 288-89 (6th Cir. 1991); United States v. Prieto-Villa, 910 F.2d 601, 610 (9th Cir. 1990).

search of a business in Duluth, Minnesota (the "Beauty Supply Store"); and 3) a Search Warrant and supporting Affidavit, dated July 20, 2007, along with an Inventory Return, dated July 31, 2007, which was filed in the United States District Court for the District of Minnesota ("Exhibit 3"), and was related to the search of a one-story home in Superior, Wisconsin (the "Superior House").   The three (3) separate Search Warrants, which were all obtained on July 20, 2007, and executed on July 24, 2007, relate to a single investigation.   Accordingly, the underlying Affidavits, which outline a two (2) year investigation, is the same for each Search Warrant, as is the list of items to be seized.   In the interest of brevity, we will cite only to Exhibit 1 in summarizing the underlying facts.

Each Search Warrant authorized a search for controlled substances; books, records, sales receipts, and other documents pertaining to controlled substance transactions and distribution; addresses, telephone books or papers tending to identify involved parties; books, records and other documents indicating the location, transfer, concealment or acquisition of monies, assets, and false identification documents; receipts, itineraries, tickets, passports, and other records relating to travel; keys and rental agreements relating to safe deposit boxes; United States currency, and other items which might constitute proceeds from illicit activities; photographs of co-

conspirators, assets, or controlled substances; paraphernalia relating to the packaging, weighing and distributing of controlled substances; firearms; electronic devices, including cellular telephones, computers, and pagers, used to store information and to intercept incoming calls, as well as the information stored on those devices; and any records or other written materials tending to show actual or constructive possession of the above items.  See, Exhibit 1, at pp. 63-64.

In support of the Search Warrants, Darin Nemerow ("Nemerow"), who is a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), and who is assigned to the Lake Superior Drug and Gang Task Force (the "Task Force"), submitted an Application and Affidavit which set forth the reasons that caused him to believe that evidence of criminal activity would be found at the Downstairs Apartment, at the Beauty Supply Store, and at the Superior House.  See, Exhibit 1, at p. 57 ¶18; pp. 59-61 ¶63; Exhibit 2, at p. 111 ¶57, pp. 113-15 ¶63; Exhibit 3, at p. 141 ¶61, pp. 142-44 ¶63.  Nemerow averred that over the course of a lengthy investigation, law enforcement investigators from the ATF, and the Task Force, had uncovered a crack cocaine distribution organization, led by the Defendant. Id. at p. 41 ¶6.  Nemerow averred that the Defendant served as a crack cocaine source

for thirty-four (34) other individuals in Duluth, Minnesota, and Superior, Wisconsin. Id. at pp. 41-42 ¶6.

Nemerow attested that, on December 13, 2005, Investigator Erickson ("Erickson") from the Task Force received information from a Confidential Reliable Informant ("CRI-1"), who stated that the Defendant was distributing crack cocaine to others, including Quincy Jonathan Mason ("Mason"). Id. at p. 42 ¶7. Nemerow averred that CRI-1 was a reliable informant, with no felony convictions, who had cooperated with law enforcement in conducting several drug transactions, whose information had been corroborated by law enforcement records, as well as Nemerow's personal knowledge, and whose information had led to several Search Warrants and arrests. Id. at p. 42 ¶8.

According to Nemerow, on March 9, 2006, Task Force investigators made a controlled purchase of crack cocaine from Felicia Marie Mason ("Felicia"), with the assistance of another Confidential Reliable Informant ("CRI-2"). CRI-2 initially went to the Beauty Supply Store in order to negotiate a drug buy with the Defendant. The Defendant refused to sell crack cocaine to CRI-2, but contacted Felicia, to have her complete the sale to CRI-2. Felicia then met CRI-2 at the Beauty Supply Store and sold CRI-2 crack cocaine. Id. at pp. 42-43 ¶9. Nemerow averred that CRI-2 was a

reliable informant, who had a felony conviction, but who had cooperated with law enforcement in conducting several drug transactions, whose information had been corroborated by law enforcement records, as well as Nemerow's personal knowledge, and who had agreed to be identified in police reports and to testify in Court.  Id. at p. 43 ¶10.

On March 10, 2006, Task Force investigators made a controlled purchase of crack cocaine from Mason, with the assistance of CRI-2.  CRI-2 initially contacted Felicia to negotiate a drug buy, but Felicia informed CRI-2 that she would send her brother.  Mason then met CRI-2 at a predetermined location and sold him crack cocaine.  When Mason left CRI-2, he traveled to the Beauty Supply Store.  CRI-2 informed investigators that he or she had heard Felicia, Mason, and the Defendant, refer to one another as siblings.  Id. at p. 43 ¶11.

On March 16, 2006, Task Force investigators made a controlled purchase of crack cocaine from Mason, with the assistance of CRI-2.   CRI-2 initially contacted the Defendant to negotiate a drug buy, but the Defendant told CRI-2 to contact his "little brother."  CRI-2 then contacted Mason, who told CRI-2 to come to the Beauty Supply Store.  When CRI-2 arrived at the Beauty Supply Store, Antwon Bernard Williams ("Williams") sold him crack cocaine.  Id. at p. 43 ¶12.  On the same date,

Task Force investigators made a controlled purchase from Mason, at the Beauty Supply Store, with the assistance of CRI-2.  Id. at p. 44 ¶13.

According to Nemerow, on June 26, 2006, Investigator Clancey ("Clancey") received information from a Confidential Informant,[3] who reported possible drug activity at the Duplex.  The Confidential Informant identified the Defendant, and Mason, as the tenants of the upstairs apartment (the "Upstairs Apartment") of the Duplex, and Aldrea Lane Siler ("Siler"), and Christopher Edward Wood ("Wood"), as the tenants of the Downstairs Apartment.  Id. at p. 44 ¶15.

On November 18, 2006, Investigator Wilson ("Wilson") received information from another Confidential Reliable Informant ("CRI-3"), who informed Wilson that the Defendant supplied crack cocaine, powder cocaine, and marijuana, to Wood, Siler, and Jolynn Laura Johnson ("Johnson").  CRI-3 also stated that he or she had seen Wood, and Siler, in possession of large quantities of marijuana, which they sold out of the Downstairs Apartment.  CRI-3 informed Wilson that, on November 17, 2006, when he or she was at the Downstairs Apartment, Wood and Siler ran out of marijuana.  Siler then went to the Upstairs Apartment and retrieved a pound of

---

[3]Nemerow averred that this Confidential Informant was known to law enforcement, but wished to remain anonymous.  See, Exhibit 1, at p. 44 ¶15.

marijuana, in order to continue his drug sales.  CRI-3 also stated that he or she had observed Wood in possession of handguns at the Downstairs Apartment.  Id. at pp. 44-45 ¶16.  Nemerow averred that CRI-3 was a reliable informant, who had felony convictions, but who had cooperated with law enforcement to conduct several drug transactions, whose information had been corroborated by law enforcement records, as well as Nemerow's personal knowledge, and whose information had led to several Search Warrants and arrests.  Id. at p. 45 ¶17.  On November 21, 2006, Task Force investigators made a controlled purchase of crack cocaine from Siler, at the Downstairs Apartment, with the assistance of CRI-3.  Id. at p. 45 ¶18.

On April 4, 2007, Task Force investigators made a controlled purchase of crack cocaine from Makenzie Lynn Ann Eggersgluess ("Eggersgluess"), with the assistance of another Confidential Reliable Informant ("CRI-4").  Eggersgluess met CRI-4 at a predetermined location, in a vehicle bearing Minnesota license plate NWV-919, and CRI-4 observed that Eggersgluess possessed a large quantity of individually wrapped packages of crack cocaine.  Investigators later determined that the vehicle, with Minnesota license plate NWV-919, was registered to Cathy Lacy at the address of the Beauty Supply Store (the "Lacy vehicle").  Id. at p. 45 ¶19.  Nemerow averred that CRI-4 was a reliable informant, who had no criminal convictions, who had cooperated

with law enforcement to conduct several drug transactions, whose information had been corroborated by law enforcement records, as well as Nemerow's personal knowledge, and who had agreed to be identified in police reports, and to testify in Court. Id. at pp. 45-46 ¶20.

According to Nemerow, on April 5, 2007, Task Force investigators made a controlled purchase of crack cocaine from Eggersgluess, with the assistance of CRI-4. Eggersgluess met CRI-4 at a predetermined location, in the Lacy vehicle, in order to conduct the transaction. Id. at p. 46 ¶21. Eggersgluess also gave CRI-4 an extra quantity of crack cocaine on credit. Id. at p. 46 ¶22. After the transaction, Investigator Toewe ("Toewe") followed Eggersgluess to an apartment building on East Third Street in Duluth, Minnesota ("Eggergluess' Apartment").[4] Id. at p. 46 ¶21.

On April 9, 2007, Task Force investigators made a controlled payment of United States currency to the Defendant, with the assistance of CRI-4. CRI-4 initially contacted the Defendant, and stated that he or she wished to pay him for the extra quantity of crack cocaine, which CRI-4 had obtained from Eggersgluess on April 5, 2007. The Defendant met CRI-4 at a predetermined location to accept the payment.

---

[4]In his Affidavit, Nemerow averred that Eggergluess resided at the apartment building on East Third Street. Id. at p. 58 ¶60.

CRI-4 also paid the Defendant an additional amount, in advance, for a future purchase of crack cocaine.  Id. at p. 46 ¶22.  Later that day, CRI-4 contacted Nemerow, and stated that the Defendant had just stopped by CRI-4's residence to deliver the additional crack cocaine.  CRI-4 informed Nemerow, however, that the Defendant had also given CRI-4 an extra quantity of crack cocaine, for which CRI-4 owed payment. Nemerow went to CRI-4's residence to pick up the crack cocaine, which Nemerow averred was consistent with the amount paid to the Defendant, plus the amount owed. Id. at p. 46 ¶23.

On April 11, 2007, Task Force investigators made a controlled buy of crack cocaine from Eggersgluess, with the assistance of CRI-4.  CRI-4 initially met with the Defendant at the Beauty Supply Store in order to complete payment for the crack cocaine delivery of April 9, 2007.  The Defendant accepted payment, but stated that CRI-4 would have to purchase any additional crack cocaine from Eggersgluess, who was also present.  Eggersgluess told CRI-4 that she would not make the sale at the Beauty Supply Store.  Eggersgluess then met CRI-4 at a predetermined location, in a vehicle bearing Minnesota license plate RMU-953, and completed the sale.  Id. at pp. 46-47 ¶24.

On that same date, Task Force investigators also made a controlled purchase of six (6) "bootleg" DVDs, again with the assistance of CRI-4.  CRI-4 went to the Beauty Supply Store, and ordered ten (10) movies which were then showing in theatres.  A black male, known as "Trip," took CRI-4's order.[5]  CRI-4 returned later to pick up the DVDs.  The Defendant was at the Beauty Supply Store with Jennifer Rosaylce Mincey ("Mincey").  The Defendant would only agree to sell six (6) DVDs to CRI-4, for $40.00.  CRI-4 purchased six (6) DVDs for that price, and Nemerow averred that all six (6) movies were then only showing in theatres, and had not yet been released for public purchase.  Id. at p. 47 ¶25.

On April 19, 2007, Task Force investigators made a controlled purchase of crack cocaine from the Defendant, and Mincey, with the assistance of CRI-4.  CRI-4 initially contacted the Defendant and negotiated the purchase.  Investigator Nagorski ("Nagorski"), who was conducting surveillance at the Duplex, then observed the Defendant, and Mincey, as they exited the Duplex.  The Defendant and Mincey traveled in a vehicle, bearing Minnesota license plate TBU-729, to meet CRI-4 in a

---

[5]Trip was later identified as Danny Roy Dillard ("Dillard"), who was an employee of the Beauty Supply Store.  See, Exhibit 1, at p. 55 ¶51.

predetermined location.  After making the sale, the Defendant and Mincey traveled to

the Beauty Supply Store.  Id. at pp. 47-48 ¶26.

On April 25, 2007, Task Force investigators made a controlled purchase of

crack cocaine from the Defendant and Mincey, with the assistance of CRI-4.  CRI-4

initially contacted the Defendant, and negotiated the purchase, and the Defendant said

that he would send Mincey to complete the sale.  Investigator McShane ("McShane"),

who was conducting surveillance at the Duplex, observed Mincey as she exited the

Duplex, and entered the Lacy vehicle.  Mincey traveled to the Beauty Supply Store,

where the Defendant exited the store, and met Mincey near her vehicle.  Mincey then

traveled to the Village Place apartment building on East Fifth Street ("Mincey's

Apartment").[6]   Erickson, who was conducting surveillance on Mincey, found

Mincey's vehicle at her apartment building.  Erickson then observed Mincey exit the

building, and drive to meet CRI-4 at a predetermined location, in order to complete the

sale.  Mincey then traveled back to the Beauty Supply Store.  Id. at p. 48 ¶27.  In his

_____

[6]On May 3, 2007, Officer Midthun obtained a tenant list for the Village Place
apartment building, which listed Mincey as a current tenant.  See, Exhibit 1, at p. 48
¶28.  In addition, on May 31, 2007, Mincey reported to the Hermantown police that
her purse had been stolen, and she listed the Village Place apartment building as her
address.  Id. at p. 52 ¶39.

- 13 -

Affidavit, Nemerow averred that he believed that the Defendant stashed his drug supply at Mincey's Apartment.  Id. at p. 58 ¶59.

On May 4, 2007, Task Force investigators made a controlled purchase of crack cocaine from the Defendant and Mincey, with the assistance of CRI-4.  CRI-4 initially contacted the Defendant and negotiated the purchase.  The Defendant instructed CRI-4 to come to his residence, which he identified as the Upstairs Apartment.  CRI-4 met the Defendant, Mincey, and Clarence James Beloch ("Beloch"), at the Upstairs Apartment.  CRI-4 observed the Defendant in the kitchen, cooking powder cocaine into crack cocaine, while Beloch packaged crack cocaine at the kitchen table.  The Defendant directed Mincey to give a package of crack cocaine to CRI-4, and directed CRI-4 to give payment to Mincey.  CRI-4 observed a large quantity of crack cocaine in the kitchen, during that transaction.  Id. at pp. 48-49 ¶29.  Later that day, Nemerow contacted the landlord of the Duplex, and confirmed that the Defendant was the tenant of the Upstairs Apartment, and that Siler, and Wood, were the tenants of the Downstairs Apartment.  Id. at p. 49 ¶31.

On May 9, 2007, Task Force investigators made a controlled purchase of crack cocaine from Eggersgluess, with the assistance of another Confidential Reliable Informant ("CRI-5").   CRI-5 initially contacted Eggersgluess, and negotiated the

- 14 -

purchase.   McShane, who was conducting surveillance at Eggergluess' Apartment, observed Eggersgluess as she left the apartment building.   Eggersgluess then traveled, in a vehicle bearing Minnesota license plate RMU-953, to meet CRI-5 at a predetermined location, so as to complete the sale.   Erickson then followed Eggersgluess as she traveled to the Beauty Supply Store.   Id. at pp. 49-50 ¶32. Nemerow averred that CRI-5 was a reliable informant, with no felony convictions in the past eight (8) years, who had cooperated with law enforcement to conduct several drug transactions, whose information had been corroborated by law enforcement records, as well as Nemerow's personal knowledge, whose information had led to two (2) arrests, and one (1) Search Warrant, and who had agreed to be identified in police reports and to testify in Court.   Id. at p. 50 ¶33.

On May 15, 2007, Task Force investigators made a controlled purchase of crack cocaine from Eggersgluess, with the assistance of CRI-4.   CRI-4 initially contacted the Defendant to negotiate a purchase, but the Defendant stated that he was out of crack cocaine.   CRI-4 then contacted Eggersgluess, and negotiated the sale. CRI-4 met Eggersgluess at Eggergluess' Apartment.   Eggersgluess did not have enough crack cocaine to complete the sale, so CRI-4 observed Eggersgluess as she made a telephone call to order additional crack cocaine.   Eggersgluess told CRI-4 that

Mincey was going to bring more crack cocaine to complete the sale.  Id. at p. 50 ¶34.

CRI-4 then left Eggersgluess' Apartment.

Investigator Poskozim ("Poskozim"), who was conducting surveillance near

Eggergluess' Apartment, observed an older white Cadillac, with collector license

plates, enter the apartment building's parking lot.  Sergeant Jenkins ("Jenkins") also

observed an older white Cadillac, with Minnesota collector plates 768933 (the

"Cadillac").[7]  Jenkins observed Mincey exit the vehicle with the Defendant standing

outside the vehicle.  After the Cadillac left the parking lot, CRI-4 returned to

Eggersgluess' Apartment, and completed the sale.  CRI-4 observed that Eggersgluess

was then in possession of a large quantity of crack cocaine.  Id. at p. 51 ¶35.  On May

19, 2007, Officer Jones conducted a traffic stop of the Cadillac, while the Defendant

was driving, and the Defendant received a traffic citation.  Id. at p. 51 ¶37.

On May 19, 2007, CRI-4 informed Nemerow that he or she had received a

telephone call from the Defendant, in which the Defendant asked CRI-4 to come to the

Beauty Supply Store.  When CRI-4 arrived at the store, the Defendant accused CRI-4

_____

[7]On May 16, 2007, Poskozim observed the Cadillac outside the Duplex, and
confirmed that it was the vehicle he saw at Eggergluess' Apartment on May 15, 2007.
See, Exhibit 1, at p. 51 ¶36.

of working with law enforcement, which CRI-4 denied.  Mincey entered the store during that conversation.  Ultimately, CRI-4 convinced the Defendant that CRI-4 was not working with law enforcement.  The Defendant admitted to CRI-4 that he refused to sell crack cocaine to CRI-4 on May 15, 2007, because of his concern that CRI-4 was working with law enforcement.  Id. at pp. 51-52 ¶38.

On June 4, 2007, Nemerow, while undercover, made a controlled purchase of crack cocaine from Sinatra Andrea Peters ("Peters").  Investigators conducting surveillance then observed Peters meeting with the Defendant, while the Defendant was in the Lacy vehicle.  Nemerow averred that he believed that the Defendant provided Peters with the crack cocaine, to sell to Nemerow, and that Peters paid the Defendant after completing the transaction with Nemerow.  Id. at p. 52 ¶40.

On June 5, 2007, Wilson and Investigator Gunderson ("Gunderson") acquired garbage from the Duplex.  The garbage included several items addressed to Siler at the Downstairs Apartment; a marijuana pipe and marijuana residue; a clothing tag with the name "Mooch" on it; and a receipt for pizza, which listed the Upstairs Apartment's address and a telephone number registered to Mincey.  Id. at p. 52 ¶41.  On June 7, 2007, Nemerow observed the Defendant, and Mincey, pumping gasoline into two (2) separate vehicles at a service station in Duluth, Minnesota.  Id. at p. 52 ¶42.

On June 7, 2007, Nemerow interviewed CRI-4.  Id. at pp. 52-53 ¶43.  CRI-4 stated that, during the Summer of 2006, the Defendant rented a vehicle for CRI-4, gave her $10,000.00 in cash, and directed her to an address in the Twin Cities.  The Defendant instructed CRI-4 to pay certain individuals the $10,000.00 for clothing for the Defendant's store.  CRI-4 followed the Defendant's directions, and acquired two (2) suitcases and a duffel bag.  The Defendant then directed CRI-4 to deliver the luggage to Johnson.  When CRI-4 did so, Johnson opened the luggage in front of CRI-4, revealing a quantity of marijuana.  Id. at p. 53 ¶44.  CRI-4 also stated that, during the Summer of 2006, the Defendant gave Mincey, and CRI-4, each a quantity of cash.  The Defendant directed CRI-4 to trade the cash in at the Fond-du-luth Casino in Duluth, Minnesota.  CRI-4 stated that Mincey went to a different location to trade in her cash.  Id. at p. 53 ¶45.  Finally, CRI-4 told Nemerow that, during the Summer of 2006, CRI-4 was at Mincey's Apartment with Mincey.  CRI-4 observed Mincey open a container, which contained a large quantity of cash, mostly in $20.00 bills, from her closet.  According to CRI-4, Mincey brought approximately half of the cash to the Beauty Supply Store.  Id. at p. 53 ¶46.

On June 18, 2007, Task Force investigators made a controlled purchase of crack cocaine from Robert Kennedy Price ("Price"), with the assistance of another

Confidential Reliable Informant ("CRI-6"). CRI-6 met Price at a predetermined location, at which point, Price told CRI-6 to travel to another location. Investigators conducting surveillance then observed Siler leave the Duplex, and meet with Price. Siler then re-entered the Duplex, while Price traveled to meet CRI-6 at the second location to complete the sale. Id. at pp. 53-54 ¶47. Nemerow averred that CRI-6 was a reliable informant, with no felony convictions in the past twenty (20) years, who had cooperated with law enforcement in conducting several drug transactions, whose information had been corroborated by law enforcement records, as well as Nemerow's personal knowledge, whose information had led to two (2) arrests and at least one (1) Search Warrant, and who agreed to be identified in police reports and to testify in Court. Id. at p. 54 ¶49.

On that same day, Wilson, who was conducting surveillance at the Duplex, observed the Defendant, and Mincey, moving belongings out of the Duplex and into a moving truck. Nemerow and Wilson then followed the moving truck, which was driven by the Defendant, to the Superior House. The Defendant, and two unknown men, then moved items from the moving truck into the Superior House. Id. at p. 54 ¶48.

- 19 -

On June 19, 2007, Task Force investigators attempted to purchase crack cocaine from Price, with the assistance of CRI-6.  CRI-6 met Price at a predetermined location and gave Price cash, at which point, Price told CRI-6 to travel to another location.  Investigators conducting surveillance then observed Price, as he met with Siler, outside of the Beauty Supply Store.  Price handed Siler the cash from CRI-6, and Siler re-entered the store.  Price then traveled to meet CRI-6, and they drove to a third location.  At that time, Price exited CRI-6's vehicle without providing any crack cocaine.  Id. at pp. 54-55 ¶50.

On that same day, Task Force investigators executed a Search Warrant at North First Avenue West, which was the residence of a Cooperating Defendant ("CD-1").  During the search, investigators recovered 40.8 grams of crack cocaine, and 110.7 grams of marijuana.  CD-1 admitted selling and distributing both drugs, and identified the Defendant as his or her drug source.  CD-1 further stated that he or she received three (3) "kits" per day from the Defendant; that each kit included ten (10) "8-balls;" and that each 8-ball contained 3.5 grams of crack cocaine.  CD-1 stated that he or she obtained drugs from Dillard, who was one of the Defendant's distributors.  CD-1 further stated that the Defendant used his girlfriend's residence to stash his drug supply.  CD-1 identified the girlfriend's residence as an apartment building near a

particular gas station.  Nemerow averred that CD-1 was referring to the Village Place apartment building, where Mincey lived.  Id. at p. 55 ¶51.

On June 21, 2007, McShane arrested another Cooperating Defendant ("CD-2"), for selling crack cocaine.  CD-2 admitted selling and distributing crack cocaine, and identified Siler as one of his or her drug sources.  CD-2 stated that he or she bought four (4) or five (5) "8-balls" from Siler at a time.  CD-2 identified "Mookie" as Siler's boss at the Beauty Supply Store, and as Siler's drug source.  Nemerow averred that he believed "Mookie" was the Defendant.  Id. at pp. 55-56 ¶52.  On the same day, Task Force investigators made a controlled purchase of crack cocaine from Eggersgluess, and Jabari Omar Samuel ("Samuel"), with the assistance of CRI-5.  CRI-5 initially contacted Eggersgluess, and negotiated the sale.  CRI-5 then met with Eggersgluess and Samuel, at a predetermined location, in order to complete the sale.  Id. at p. 56 ¶53.

On July 16, 2007, Task Force investigators arrested another Cooperating Defendant ("CD-3").  CD-3 admitted selling and distributing crack cocaine, and identified "Mooch" and "Jenny" as his or her drug sources.  Nemerow averred that he believed "Mooch" and "Jenny" are the Defendant and Mincey.  Id. at p. 56 ¶54.  On that same day, CD-3 made a telephone call to the Defendant, so as to negotiate a

controlled purchase of crack cocaine. Investigators recorded the telephone call, which was made to the Defendant's cellular telephone. The Defendant informed CD-3 that he was waiting for a delivery of crack cocaine, which should arrive in approximately two (2) hours. Nemerow averred that the voice on the recorded telephone call was that of the Defendant. CD-3 later informed Wilson that he or she had spoken with the Defendant later that day, and that the Defendant stated that he had received his crack cocaine delivery, and he invited CD-3 to make a purchase. Id. at p. 56 ¶55.

On July 17, 2007, Task Force investigators made a controlled purchase of crack cocaine from Mincey, with the assistance of CD-3. CD-3 initially contacted Mincey by telephone -- a call that was recorded by investigators -- and negotiated the purchase. Investigators, who were conducting surveillance at the Superior House, observed Mincey at that location. Mincey entered a red Dodge Durango, bearing Illinois license plate 9877406 (the "Durango"), and traveled to her apartment. Mincey entered the apartment building, and then returned to her vehicle, where she traveled to a predetermined location to meet CD-3. After the transaction, investigators followed Mincey back to the Superior House. Nemerow averred that he was able to see, and identify Mincey, during that transaction. Id. at p. 57 ¶56.

As noted, Nemerow secured Search Warrants for the Beauty Supply Store, the Downstairs Apartment, and the Superior House.  In his Affidavit, Nemerow averred that the Beauty Supply Store was the Defendant's business, at which the Defendant, and others, engaged in the negotiation and sale of crack cocaine.  Id. at p. 57 ¶57. Nemerow averred that the Downstairs Apartment was the residence of Siler, at which Siler engaged in the sale of crack cocaine and marijuana.  Nemerow further averred that Siler was employed by the Defendant, at the Beauty Supply Store, and that the Defendant formerly resided at the Upstairs Apartment of the Duplex.  Id. at p. 57 ¶58. Nemerow also averred that the Superior House was the Defendant's new residence, and that Mincey sometimes stayed at the house.  Nemerow attested that the Defendant, and Mincey, used the Superior House to facilitate their drug transactions.  Id. at p. 58 ¶61.

Finally, Nemerow swore that, during the course of the investigation, he showed CRI-2 photographs of the Defendant, Felicia, and Mason, and that CRI-2 positively identified those individuals, using aliases known to law enforcement.  Id. at p. 42 ¶¶7, 9, p. 44 ¶14.  Nemerow further averred that he showed CRI-4 photographs of Mincey, Eggersgluess, Siler, Wood, and Johnson, and that CRI-4 positively identified those individuals, using aliases known to law enforcement.  Id. at p. 49 ¶30.  Nemerow

- 23 -

stated that he only showed CRI-2, and CRI-4, photographs of the referenced individuals, rather than conducting a photographic line-up.  Nemerow also stated that he did not make any suggestive comments to CRI-2, or CRI-4, during the photographic identifications.  Id. at p. 44 ¶14, p. 49 ¶30.  He further averred that Task Force investigators had been able to visually identify the Defendant, Mincey, and Eggersgluess, during the course of several controlled narcotics purchases.  Id. at p. 49 ¶30.

In further support of his Search Warrant application, Nemerow attested that, based upon his training and experience in law enforcement, and particularly narcotics and firearms investigations, he believed that drug traffickers maintained information, which related to their drug transactions, in their homes and businesses, including records, receipts, notes, ledgers, as well as bank and rental records.  He also stated that drug traffickers often make use of cellular telephones, pagers, and computers, in order to conduct their drug business; they use false identification documents to conceal their true identity; and they maintain audio and video recordings, as well as photographs, of their co-conspirators, controlled substances, and assets.  See, Exhibit 1, at pp. 40-41 ¶¶2-5, pp. 59-61 ¶63.

III.  Discussion

A.    The Defendant's Motion to Suppress Any Identifications.

In his Motion, the Defendant asks that we suppress any identifications, which were obtained in violation of his constitutional rights.   No testimony was adduced at the Hearing on the Defendant's Motion, and therefore, we limit our consideration to the Record, as presented in the Affidavits which underlie the Search Warrants.

1.    Standard of Review.   Generally speaking, in cases in which the identity of the accused is at issue, the accused may move, under the Due Process Clause,[8] to suppress an out-of-Court identification that was secured by law enforcement officials through improper means.   See, Neil v. Biggers, 409 U.S. 188, 199 (1972).   Moreover, the Due Process challenge will extend to an anticipated in-Court identification if it was tainted by the erroneous out-of-Court procedures.   See,

_____

[8]We recognize that, once a Defendant's Sixth Amendment right to counsel has attached, grounds may then exist for a successful challenge to the admissibility of a lineup identification which was conducted in the absence of counsel. See, United States v. Wade, 388 U.S. 218 (1967). However, the Supreme Court long ago declared that, whether pre- or post-Indictment, photographic displays, when conducted without the presence of the defendant, do not implicate a defendant's Sixth Amendment rights. See, United States v. Ash, 413 U.S. 300, 317-21 (1973). Therefore, finding no basis for the suppression of the photographic identification of the Defendant under the Sixth Amendment, we limit our analysis to the protections provided by the Due Process Clause.

Foster v. California, 394 U.S. 440, 443-44 (1969); United States v. Tucker, 169 F.3d 1115, 1117-18 (8th Cir. 1999); Williams v. Lockhart, 736 F.2d 1264, 1266 (8th Cir. 1984).

Where, as here, an out-of-Court identification, through the use of an accused's photograph, is at issue, our Court of Appeals uses a two-step admissibility analysis that was first adopted by the Supreme Court in Manson v. Brathwaite, 432 U.S. 98, 116 (1977).  See, United States v. Gipson, 383 F.3d 689, 698 (8th Cir. 2004); United States v. Johnson, 56 F.3d 947, 953 (8th Cir. 1995).  First, the Court must determine whether the challenged photographic identification procedure was "impermissibly suggestive."   United States v. Gipson, supra at 698; see also, United States v. Johnson, supra at 953; Manson v. Brathwaite, supra at 116.  Then, should it be determined that the procedures were impermissibly suggestive, the Court must determine if the identification was, nonetheless, reliable.  See, Clark v. Caspari, 274 F.3d 507, 511 (8th Cir. 2001); Thomas v. Bowersox, 208 F.3d 699, 702 (8th Cir. 2000); United States v. Davis, 103 F.3d 660, 669 (8th Cir. 1996), cert. denied, 520 U.S. 1258 (1997)("Reliability is the linchpin in determining the admissibility of identification testimony * * *.")[internal quotation omitted]; see also, Williams v.

Lockhart, supra at 1266 (concluding that not all suggestive identification procedures violate due process).

Consequently, identification evidence will be admissible at Trial unless the totality of circumstances demonstrates that impermissibly suggestive procedures "created a very substantial likelihood of irreparable misidentification."  United States v. Gipson, supra at 698, citing United States v. Johnson, supra at 953; see also, Palmer v. Clarke, 408 F.3d 423, 435 (8th Cir. 2005); Clark v. Caspari, supra at 513 (Hansen, C.J., concurring), quoting Manson v. Brathwaite, supra at 116-17.  To determine reliability, five factors are to be considered:  the opportunity of the witnesses to view the defendant at the relevant time; the witnesses' degree of attention when viewing the defendant; the accuracy of the original descriptions given by the witnesses; the level of certainty in their identifications; and the passage of time between their observations of the defendant, and the photographic identifications. See, United States v. Gipson, supra at 698; Manson v. Brathwaite, supra at 114.

2.   Legal Analysis.   We find, in view of the totality of the circumstances presented, that CRI-2's identification of the Defendant, based upon the photograph presented by Nemerow, was reliable, and should not be suppressed.

- 27 -

Our analysis begins by noting that CRI-2 was only presented with one (1) photograph by Nemerow, upon which he or she was asked to identify the person depicted. Since CRI-2 was not presented with an array of photographs, we assume, without deciding, that the presentation of a single photograph was suggestive.[9] See, United States v. Williams, 340 F.3d 563, 566-67 (8th Cir. 2003); United States v. Patterson, 20 F.3d 801, 806 (8th Cir. 1994)("Single-photograph displays such as the ones employed in the present case are considered impermissibly suggestive by this court."), citing United States v. Murdock, 928 F.2d 293, 297 (8th Cir. 1991).

We make our assumption in order to analyze the question cautiously, and to afford the Defendant any benefit of a doubt. Nonetheless, we recognize that, in United States v. Dobbs, 449 F.3d 904, 909 (8th Cir. 2006), cert. denied, --- U.S. ---, 127 S.Ct. 1312 (2007), our Court of Appeals distinguished both Williams, and Patterson, as well as the Supreme Court's decision in Simmons v. United States, 390 U.S. 377, 383-85 (1968), and found a single photographic lineup was not impermissibly suggestive. There, a surveillance tape of a convenience store robbery was shown to persons who

_____

[9]Ordinarily, when presented with this issue, one of the interested parties will present the photograph, or the photographic array, for our independent review. Here, they have not, and we assess the "impermissibly suggestive prong" of analysis solely on the basis of the averments in Nemerow's Affidavit.

knew the defendants, and who identified them from the videotape.   Given that

circumstance, the Court determined that reliance upon <u>Williams</u>, <u>Patterson</u>, and

<u>Simmons</u>, was misplaced, since "[t]he women who identified [the defendants] on the

tape were not eyewitnesses being asked to recall their impression of a stranger during

a short encounter in the emotionally charged context of an armed robbery," but "were

individuals already acquainted with [the defendants]."   <u>Id.</u> at 909-10.   As the Court

explained:

> When an eyewitness is shown an improper lineup or photo
> array, undue suggestiveness may be prejudicial because the
> suggestiveness may cause the eyewitness to falsely recollect
> the face of the person who committed the offense. In
> contrast, when someone already familiar with a suspect is
> asked to comment on whether a recorded voice or image
> portrays the suspect, these concerns are absent.  In general,
> a girlfriend, relative, or other acquaintance is better
> equipped than a juror to determine if an image on a tape is,
> in fact, the image of the known person.   This superior
> ability makes such a witness, if deemed credible, a valuable
> aid to the jury.

<u>Id.</u> at 910 [footnote omitted].

Here, however, we assume that the display of one photograph was suggestive, as the

photograph displayed to the confidential informants is not before us, and we do not

know the precise content of the question posed to the informants, other than the

uncontroverted evidence that the question did not contain "any clues or suggestive

comments about the individuals in the photographs." Exhibit 1, at p. 44 ¶14, p. 49
¶30. Accordingly, we proceed to the second prong of the inquiry.

"Even if a photographic identification procedure is impermissibly suggestive,
* * * the 'central question' regarding eyewitness identification * * * is 'whether, under
the totality of the circumstances, the identification was reliable despite any suggestive
or inappropriate pre-trial identification techniques." Palmer v. Clarke, supra at 435,
quoting Trevino v. Dahm, 2 F.3d 829, 833 (8th Cir. 1993). Again, based upon the
Record presented, we conclude that CRI-2's identification was reliable, given the
averments made in Nemerow's Affidavit.

The Record reflects that CRI-2 participated in at least four (4) drug transactions
during this investigation, at the direction of law enforcement, over the course of one
(1) month. Nemerow showed the Defendant's photograph to CRI-2 during the course
of this investigation, and CRI-2 professed to having an opportunity to view the
Defendant, at close range, during the course of negotiating one (1) of the controlled
purchases with the Defendant. Although Nemerow's Affidavit does not state whether
CRI-2 immediately identified the Defendant as the person depicted in the photographs,
after observing it, there is no suggestion, in the Record, that CRI-2 was hesitant in his
or her identification. Given the exposure which CRI-2, as an eyewitness, had to the

- 30 -

Defendant, as a result of his or her role in the controlled purchases, we find the identification reliable.

The circumstances presented are analogous to those before our Court of Appeals in United States v. Puckett, 147 F.3d 765 (8th Cir. 1998). In Puckett, the eyewitness was shown a single photograph of the defendant after a number of controlled purchases, and asked "whether the person portrayed was the individual who had conducted the sale." Id. Our Court of Appeals noted that the procedure "seems quite suggestive," but noted that the circumstances surrounding the identification were reliable, and affirmed the Trial Court's denial of the defendant's suppression Motion. Id. The circumstances included corroborating identifications made by others, familiarity with the defendant, and multiple controlled purchases made from the defendant. We find those circumstances to be present here, and additionally, there is no evidence that the question asked was "whether the person portrayed was the individual who had conducted the sale," but rather, the question posed would have to have prompted the response, of Record, that the picture was of a person who held a nickname of one of the Defendant, or of one of his co-Defendants.

Moreover, given that investigators were able to independently identify the Defendant during the course of several controlled purchases, we find the likelihood of

any misidentification unlikely. See, United States v. Puckett, supra at 769 (recognizing that the "testimony of other witnesses indicates that a misidentification was unlikely"); United States v. Rogers, 73 F.3d 774, 778 (8th Cir. 1996)(finding no due process violation in the identification of a defendant as "[i]n addition to [one eyewitness's] testimony, at least two other government witnesses identified the [defendant]," and "[t]he additional testimony diminishes any likelihood of irreparable misidentification in this case."); see also, United States v. Webb, 168 F.3d 496, 1999 WL 23160 at *1 (8th Cir. 1999) [Table disposition].

Here, as attested by Nemerow in his Affidavit, CRI-2, upon viewing the photograph, positively identified the Defendant as the person involved in the controlled purchase, even going so far as to identify the Defendant by his nickname of "Mooch." Accordingly, because there is nothing to demonstrate that the challenged identification procedures were unreliable, we recommend that the Defendant's Motion to Suppress the photographic identification be denied.[10]

---

[10]Under somewhat analogous circumstances, we made the same Recommendation in United States v. Nururdin, 2006 WL 3206084 at *10-11 (D. Minn., November 3, 2006), although, there, the evidence pertaining to the identification was in the form of witness testimony, and not upon the averments of an Affidavit.

B.    The Defendant's Motion to Suppress Any Evidence
      Obtained as a Result of Any Illegal Searches.

In his Motion, the Defendant asks that we review each of the Search
Warrants in order to determine whether they were supported by probable cause, or
contained other fatal defects.   No testimony was adduced at the Hearing on the
Defendant's Motion, and therefore, as have the parties, we limit our consideration to
the "four corners" of the challenged Search Warrant, and address each Search
Warrant in turn.[11]

      1.    The Search Warrant for the Downstairs Apartment.

      a.    Standard of Review.   Any person asserting a Fourth
Amendment protection " must demonstrate that he personally has an expectation of
privacy in the place searched, and that his expectation is reasonable." Minnesota v.
Carter, 525 U.S. 83, 83 (1998), citing Rakas v. Illinois, 439 U.S. 128, 138-44 (1978);
see also, United States v. Kuenstler, 325 F.3d 1015, 1019 (8th Cir. 2003)("The Fourth
Amendment protects against unreasonable searches and seizures, but its protections

---

[11]The analysis which follows is unaided by any pre- or post-Hearing briefing,
and no specific recitation, during the course of the Hearing, as to any purported
deficiencies in the Warrants at issue.   Of course, our obligation is to independently
assess the legitimacy of the Warrants, to undertake our own independent research, and
the Recommendations we make reflect our attention to those details.

are personal and cannot be asserted by persons lacking a legitimate expectation of privacy in the place searched."); United States v. Green, 275 F.3d 694, 698 (8th Cir. 2001)("Fourth Amendment rights are personal and may not be asserted vicariously."), citing United States v. McCaster, 193 F.3d 930, 933 (8th Cir. 1999).

"To establish a legitimate expectation of privacy, [a] defendant[] must demonstrate: (1) a subjective expectation of privacy; and (2) that this expectation is one that society is prepared to recognize as objectively reasonable." United States v. Green, supra at 699, citing United States v. Muhammad, 58 F.3d 353, 355 (8th Cir. 1995). In the absence of such a showing, "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." Rakas v. Illinois, supra at 134.

b. Legal Analysis. Here, the Defendant has failed to demonstrate that he had a legitimate expectation of privacy in the Downstairs Apartment. The Defendant was the tenant of the Upstairs Apartment at the same Duplex but, at the Hearing, the Defendant's counsel expressly denied that the Defendant had any interest in the Downstairs Apartment. Perforce, the Defendant has not asserted any privacy interest whatsoever in the Downstairs Apartment.

- 34 -

Accordingly, the Defendant lacks "standing" to challenge the legitimacy of the search at the Downstairs Apartment.[12]  See, <u>United States v. Brown</u>, 408 F.3d 1049, 1051 (8th Cir. 2005)(no reasonable expectation of privacy in house of another when defendant was not present at time of search, did not live at residence, and did not have key to residence).   We recommend, therefore, that the Defendant's Motion to Suppress Evidence of Search and Seizure, as it pertains to the Downstairs Apartment, be denied.

        2.     <u>The Search Warrant for the Beauty Supply Store</u>.

        a.     <u>Standard of Review</u>. In the issuance of a Search Warrant, the Fourth Amendment dictates that an impartial, neutral, and detached Judicial

---

[12]With respect to "standing," we follow our Court of Appeals' approach, as explained in <u>United States v. Green</u>, 275 F.3d 694, 698 n. 3 (8th Cir. 2001):

> We use the term "standing" as a shorthand reference to the issue of whether the defendants' Fourth Amendment interests were implicated by the challenged government actions.  "Technically, the concept of 'standing' has not had a place in Fourth Amendment jurisprudence * * * since the Supreme Court in Rakas v. Illinios, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 386 (1978), indicated that matters of standing in the context of searches and seizures actually involved substantive Fourth Amendment law."   United States v. Sanchez, 943 F.2d 110, 113 n.  1 (1st Cir. 1991).

Officer, will assess the underlying factual circumstances so as to ascertain whether probable cause exists to conduct a search, or to seize incriminating evidence, the instrumentalities or fruits of a crime, or contraband.  See, Warden v. Hayden, 387 U.S. 294 (1967); United States v. Johnson, 64 F.3d 1120, 1126 (8th Cir. 1995), cert. denied, 516 U.S. 1139 (1996).  In order to find probable cause, it must be demonstrated that, in light of all the circumstances set forth in the supporting Affidavit, there is a fair probability that contraband, or evidence of a crime, will be found in a particular, designated place.  See, United States v. Gladney, 48 F.3d 309, 313 (8th Cir. 1995); United States v. Tagbering, 985 F.2d 946, 949 (8th Cir. 1993).  For these purposes, probable cause is "a fluid concept, turning on the assessment of probabilities in particular factual contexts, not readily, or even usefully, reduced to a neat set of legal rules."  Illinois v. Gates, 462 U.S. 213, 232 (1983); see also, Ornelas v. United States, 517 U.S. 690, 695 (1996).

"Search warrant '[a]pplications and affidavits should be read with common sense and not in a grudging hyper technical fashion.'"  United States v. Ryan, 293 F.3d 1059, 1061 (8th Cir. 2002), quoting United States v. Goodman, 165 F.3d 610, 613 (8th Cir. 1999), cert. denied, 527 U.S. 1030 (1999).  In conducting such an examination, the Court should review the Affidavits as a whole, and not on a

paragraph-by-paragraph basis.  See, United States v. Anderson, 933 F.2d 612, 614 (8th Cir. 1991); Technical Ordnance, Inc. v. United States, 244 F.3d 641, 649 (8th Cir. 2001), cert. denied, 534 U.S. 1084 (2002).

Moreover, the reviewing Court must not engage in a de novo review but, rather, should accord great deference to the decision of the Judicial Officer who issued the Warrant.  See, United States v. Maxim, 55 F.3d 394, 397 (8th Cir. 1995), cert. denied, 516 U.S. 903 (1995); United States v. Curry, 911 F.2d 72, 75 (8th Cir. 1990), cert. denied, 498 U.S. 1094 (1991).  This mandated deference to the determination of the issuing Judicial Officer is consistent with the Fourth Amendment's sound preference for searches that are conducted pursuant to Warrants.  See, Illinois v. Gates, supra at 236.

b.    Legal Analysis.  Our review of the Search Warrant for the Beauty Supply Store, and its underlying application, confirms the appraisal of the issuing Judicial Officer, that ample probable cause supported the issuance of the Warrant, and further, that the Warrant was not otherwise fatally defective.  Necessarily, we address, at the threshold, two critical issues:  1) whether the information provided by the informants was reliable, and 2) whether the information was fatally stale.

1)      Whether the Information was Reliable.  We recognize that much of the information, which is contained in the Affidavit, was supplied by the Confidential Reliable Informants who worked with Nemerow, and the Task Force. When probable cause for a Search Warrant is based on information provided by an informant, "'a key issue is whether that information is reliable.'"  United States v. Koons, 300 F.3d 985, 993 (8th Cir. 2002), quoting United States v. Fulgham, 143 F.3d 399, 401 (8th Cir. 1998); see also, United States v. Reivich, 793 F.2d 957, 959 (8th Cir. 1986)("[T]he informant's reliability, veracity, and basis of knowledge are relevant considerations -- but not independent, essential elements -- in finding probable cause.").  As our Court of Appeals has stated:

> In [Illinois v.] Gates, the Supreme Court explained that an informant's reliability and basis of knowledge "are better understood as relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable-cause determinations:  a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." * * * 462 U.S. at 233, 103 S.Ct. at 2329.

United States v. Olson, 21 F.3d 847, 850 (8th Cir. 1995).

As a result, "'an informant's basis of knowledge [is] an important consideration, but not a rigid requirement, in the probable cause determination.'"  Id., citing United States v. Anderson, supra at 615.

Consequently, the "core question" is whether the information, which was provided by the informant, was reliable.  See, United States v. Williams, 10 F.3d 590, 593 (8th Cir. 1993)("The core question in assessing probable cause based upon information supplied by an informant is whether the information is reliable."). Moreover, "[t]he statements of a reliable confidential informant are themselves sufficient to support probable cause." United States v. Wright, 145 F.3d 972, 975 (8th Cir. 1998).   In turn, an informant is deemed reliable when his statements are corroborated by independent evidence.  See, United States v. Carpenter, 341 F.3d 666, 669 (8th Cir. 2003) ("[C]orroboration of minor, innocent details may support finding of probable cause."), citing United States v. Tyler, 238 F.3d 1036, 1039 (8th Cir. 2001); see also, United States v. Koons, supra at 993 ("'Information may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of supplying reliable information, or if it is corroborated by independent evidence.'"), quoting United States v. Fulgham, supra at 401; United States v. Formaro, 152 F.3d 768, 770 (8th Cir. 1998)("[C]orroboration of the

confidential informant's information by independent investigation is an important factor in the calculus of probable cause.").

Here, we find that Nemerow reasonably relied upon the information provided by the Confidential Reliable Informants, because those informants were known to Nemerow, see, United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005), quoting Florida v. J.L., 529 U.S. 266, 270 (2000)("[A] known informant * * * can be held responsible if her allegations turn out to be fabricated."), because the informants had cooperated with law enforcement in the past, see, United States v. Leppert, 408 F.3d 1039, 1041 (8th Cir. 2005)(reliability of informant's tip was established where informant had provided reliable information in the past, and at least some of the tip was corroborated by an independent investigation), and because the information was corroborated by law enforcement.  See, United States v. Rivera, 410 F.3d 998, 1002 (8th Cir. 2005)(informant's credibility was established where his representations were corroborated by officer surveillance, and the recovery of narcotics from the informant following a controlled drug transaction); United States v. Smith, 266 F.3d 902, 905 (8th Cir. 2001)(finding that an Affidavit which detailed an officer's surveillance of controlled drug transactions provided probable cause to support a Search Warrant).

In addition, we conclude that Nemerow reasonably relied on the statements made by the Cooperating Defendants, who, through their statements, acted against their own penal interests, by implicating themselves in the drug-dealing activities of the Defendant.  See, United States v. Allen, 297 F.3d 790, 794-95 (8th Cir. 2002) ("[E]ven though [the informant] had no record as an informant, the information he provided was sufficiently credible both because his statements were against his penal interest and because the police were able to corroborate some of the information he provided."), citing United States v. Tyler, supra at 1039.

As such, we concur with the implicit determination of the issuing Judicial Officer, that probable cause was present to believe that the Defendant was engaged in ongoing narcotics trafficking, over a period spanning more than one (1) year, and within only a few days of the issuance of the Search Warrant.  Moreover, it is undisputed that law enforcement had established a nexus, between the Defendant and the Beauty Supply Store, given the undisputed evidence that the Defendant owned and operated the store.  In his Affidavit, Nemerow averred that, given his training and experience, persons who are involved in the distribution of narcotics often keep

evidence relating to their drug business in their residences or at their businesses.[13]

Nemerow also detailed numerous occasions, over the course of the investigation, on

which an informant conducted some portion of a controlled purchase at the Beauty

Supply Store, including two (2) occasions on which the transaction was consummated

there.  See, United States v. Oropesa, 316 F.3d 762, 768 (8th Cir. 2003)(Corroborated

information, from informant, concerning defendant's use of business in drug business,

"supported the conclusion that there was a fair probability that evidence of drugs

would be present" at defendant's business).

Considering the totality of the circumstances, we find that Nemerow's Affidavit

provided probable cause to believe that evidence of criminal activity would be

uncovered at the Beauty Supply Store.

───────────────────

[13]Consistent with Nemerow's averments, our Court of Appeals has repeatedly recognized that "information in the affidavit showing that [the defendant] engaged in a continuing course of drug trafficking * * * along with [the Affiant's] averment based upon his experience that drug traffickers often keep in their residences records of their elicit activity, large amounts of cash, assets purchased with the proceeds of drug transactions, and guns to protect their guns and cash, provided the issuing judge with a substantial basis for finding probable cause to search [the defendant's] residence." United States v. Luloff, 15 F.3d 763, 768 (8th Cir. 1994); see, United States v. Walker, 324 F.3d 1032, 1038 (8th Cir. 2003); United States v. Premises Known as 6040 Wentworth Ave. South Mpls., 1996 WL 260745 at * 4 (D. Minn. 1996), aff'd, 123 F.3d 685 (8th Cir. 1997); see also, United States v. Thomas, 989 F.2d 1252, 1254 (D.C. Cir. 1993).

2)     <u>Whether the Information was Fatally Stale</u>.  "It is axiomatic that probable cause must exist at the time of the search and not merely at sometime earlier."  <u>United States v. Kennedy</u>, 427 F.3d 1136, 1141 (8th Cir. 2005), citing <u>United States v. Formaro</u>, supra at 771; see, <u>United States v. Ozar</u>, 50 F.3d 1440, 1446 (8th Cir. 1995), cert. denied, 516 U.S. 871 (1995).  Therefore, a lapse of time, between the observations of a witness and the issuance of a Search Warrant, like a delay in executing a Search Warrant, "may make probable cause fatally stale." <u>United States v. Maxim</u>, supra at 397 [quotations omitted].

"There is no bright-line test for determining when information is stale," and the passage of time, alone, is "not always the controlling factor," as other factors, such as "the nature of the criminal activity involved and the kind of property subject to the search," are also relevant to the inquiry.  <u>Id.</u>, quoting <u>United States v. Koelling</u>, 992 F.2d 817, 822 (8th Cir. 1993); <u>United States v. Rugh</u>, 968 F.2d 750, 754 (8th Cir. 1992); see also, <u>United States v. Kennedy</u>, supra at 1141; <u>United States v. Chrobak</u>, 289 F.3d 1043, 1046 (8th Cir. 2002).  As but one example, when the Affidavit alleges an "ongoing continuous criminal enterprise, the passage of time between the receipt of information and the search becomes less critical in assessing probable cause." <u>United States v. Rugh</u>, supra at 754.

Therefore, in our analysis, we must not "simply count[] the number of days between the occurrence of the facts supplied and the issuance of the affidavit," but must consider any passage of time "in the context of a specific case and the nature of the crime under investigation." United States v. Maxim, supra at 397, quoting United States v. Koelling, supra at 822. Furthermore, "'where recent information corroborates otherwise stale information, probable cause may be found.'" United States v. Ozar, supra at 1446, quoting United States v. Macklin, 902 F.2d 1320, 1326 (8th Cir. 1990), cert. denied, 498 U.S. 1031 (1991).

As our Court of Appeals has explained, "[i]n investigations of ongoing narcotic operations, 'intervals of weeks or months * * * [do] not necessarily make the information stale.'" United States v. Smith, supra at 905, quoting United States v. Formaro, supra at 771; see also, United States v. LaMorie, 100 F.3d 547, 554 (8th Cir. 1996)("Where continuing criminal activity is suspected, the passage of time is less significant."). "'[W]here recent information corroborates otherwise stale information, probable cause may be found.'" United States v. Ozar, supra at 1446, quoting United States v. Macklin, supra at 1326; see also, United States v. Tyler, supra at 1039 (finding that Affidavit which referenced controlled purchases occurring "within the last seven months" was not unduly stale).

- 44 -

Here, we find that the information contained in the Search Warrant had not become impermissibly stale by the time the Search Warrant was issued, and executed. Not only did that information relate to an ongoing narcotics investigation, but it had been "freshened" with more current information, which had occurred within the previous week, including the continuing drug trafficking activity at the Defendant's residence, within days of the application for, and issuance of, the Warrant.   See, United States v. Ozar, supra at 1446 ("'[W]here recent information corroborates otherwise stale information, probable cause may be found.'"), quoting United States v. Macklin, supra at 1326; see also, United States v. Morrow, 2004 WL 385278 at *1 (8th Cir., March 2, 2004)("The seven-day delay did not render stale the information on which the Warrant was based."), citing United States v. Gibson, 123 F.3d 1121, 1124-25 (8th Cir. 1997)(four-day delay did not render the Warrant stale where drug activity was ongoing).

Therefore, we find nothing stale about the information upon which probable cause was predicated, and we reject the Defendant's argument that the Search Warrant, for the Beauty Supply Store, was defective on probable cause grounds.[14]

---

[14]Even if the information in the Search Warrant had been insufficient to establish probable cause, or was impermissibly stale, we would be compelled, by the law of this

Accordingly, we recommend that the Defendant's Motion to Suppress, insofar as it pertains to the Beauty Supply Store, be denied.

3.      The Search Warrant for the Superior House.

As to the Search Warrant for the Superior House, we understand the Defendant to challenge its issuance on the basis of Rule 41, Federal Rules of Criminal Procedure.   Although we find, for the reasons explained more fully below, that the Search Warrant for the Superior House violated the requirements of Rule 41, we conclude that suppression is not required in this case.   In addition, we have examined the Search Warrant for a lack of probable cause, and for other defects, and, finding none, we recommend that the Defendant's Motion to Suppress Evidence seized at the Superior House be denied.   We address each of the issues in turn.

a.      Probable Cause.   At the outset, we conclude that the information in the Affidavit was not impermissibly stale, with respect to the Superior House, and that Nemerow reasonably relied on the information provided by the Confidential Reliable Informants, the Cooperating Defendants, and his fellow

---

Circuit, to find that the officers' reliance upon the Search Warrant was reasonable, because the Warrant was "not so facially lacking in probable cause as to preclude the executing officers' good faith reliance thereon."   United States v. McNeil, 184 F.3d 770, 775 (8th Cir. 1999), citing United States v. Leon, 468 U.S. 897, 922-23 (1984).

investigators, in his Affidavit and Search Warrant Application. We base these conclusions on our analysis that related to the Search Warrant for the Beauty Supply Store, which we do not replicate here.

Further, we conclude that Nemerow's Affidavit established a sufficient nexus, between the Defendant and the Superior House, so as to support probable cause, and to justify the issuance of the Search Warrant. Here, Nemerow averred that, given his training and experience, persons who are involved in the distribution of narcotics often keep evidence relating to their drug business in their residences. Considering the ongoing nature of the Defendant's drug related activities, along with Nemerow's averments concerning the ordinary behavior of those persons who are engaged in drug related activities, the absence of any observed transactions at the Superior House does not, in and of itself, render the Search Warrant fatally defective, given that the Defendant's occupancy in that residence was established in the Supporting Affidavit. See, Footnote 12; see also, United States v. Etheridge, 1998 WL 792467 at *1 (8th Cir., November 17, 1998)(finding that probable cause to believe that the defendant was engaged in illicit drug trafficking was sufficient to provide probable cause to believe that the defendant's residence would contain evidence of criminal activity, "[s]ince it

is well known that drug traffickers routinely keep packaging equipment, ledgers, and other incriminating items in their living quarters.").

In his Affidavit, Nemerow averred that investigators observed the Defendant move his belongings from the Upstairs Apartment -- his former residence -- to the Superior House.  Investigators, who were conducting surveillance of a controlled purchase between CD-3, and Mincey, observed Mincey traveling to and from the Superior House.  Nemerow further averred that, at the conclusion of the Task Force's investigation, he believed the Superior House was the Defendant's permanent residence.  Nowhere in this Record does the Defendant dispute that the Superior House was his residence.

Undoubtedly, the tie between the Superior House, and the Defendant, could have been stronger -- by, say, records or documents in which the Defendant listed that apartment as his address -- nonetheless, our function, at this juncture, is not to review the Search Warrant de novo, but simply to determine whether the issuing Judicial Officer "had a substantial basis for * * * concluding that probable cause existed." United States v. Olvey, 437 F.3d 804, 807 (8th Cir. 2006), quoting United States v. Gladney, supra at 312.  Here, we are satisfied that the Affidavit presented a sufficient nexus, between the Superior House and the Defendant, to satisfy the probable cause

standard.  Therefore, we find that the information provided by Nemerow's Affidavit established "a probability or substantial chance of criminal activity" occurring at the Superior House, and being committed by the Defendant.   See, <u>United States v. Neumann</u>, 183 F.3d 753, 756 (8th Cir. 1999)("Probable cause requires 'only a probability or substantial chance of criminal activity, not an actual showing of such activity.'"), quoting <u>Illinois v. Gates</u>, supra at 243-44 n. 13.

       b.    <u>The Good Faith Exception under United States v. Leon</u>.

       Even assuming, however, that probable cause were lacking to justify the search of the Superior House, suppression would be improper under the "good faith exception" that was articulated in <u>United States v. Leon</u>, 468 U.S. 897, 922 (1984).   Under <u>Leon</u>, the exclusionary rule does not apply to evidence that is discovered through the execution of a subsequently invalidated Search Warrant, so long as the officer's reliance on the Warrant was objectively reasonable.   <u>Id.</u>   The <u>Leon</u> Court went on to identify four situations in which an officer's reliance on a Warrant would be unreasonable:

     (1)    the affiant included information in the affidavit that he "knew was false or would have known was false except for his reckless disregard of the truth" and that information misled the issuing judicial officer;

- 49 -

(2)     the issuing judge abandoned his neutral judicial role;

(3)     the warrant was based on an affidavit with so few indicia of probable cause that an official belief in its validity would be unreasonable; and

(4)     the warrant itself was so "facially deficient * * * that the executing officers" could not reasonably rely on its validity.

United States v. Simpkins, 914 F.2d 1054, 1057 (8th Cir. 1990), cert. denied, 498 U.S. 1101 (1991), citing United States v. Leon, supra at 923.

Here, there is not the slightest suggestion that there was any "reckless disregard for the truth," or that the issuing Judicial Officer was less than neutral in issuing the Warrant for the search of the Superior House.  Consequently, we turn to Nemerow's Affidavit, and to the Search Warrant itself, in order to determine whether the Warrant was so "facially deficient," or "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."  United States v. Leon, supra at 923.

In addressing the applicability of the good faith exception under the circumstances presented, we are guided by the analysis of our Court of Appeals in United States v. Carpenter, supra.  In Carpenter, the defendant sought to exclude evidence that was obtained during the execution of a Search Warrant, in part, because the Search Warrant Application did not provide information to suggest a nexus between the contraband, and the place to be searched.  Id. at 668.  The Court

- 50 -

assumed that such a deficiency, along with a number of other asserted deficiencies in

the Search Warrant Application, was sufficient to demonstrate an absence of probable

cause, but went on to find that exclusion was inappropriate under Leon.  Id. at 668,

670.

       In so holding, the Court reasoned as follows:

> The third potential infirmity with the affidavit relates to the
> issuing magistrate's inference that there was a "fair
> probability that contraband or evidence of a crime [would]
> be found" at the [searched] residence even though the
> affidavit did not present facts to indicate the existence of a
> nexus between [searched] residence and the suspected
> contraband. Gates, 462 U.S. at 238, 103 S.Ct. 2317
> (defining "fair probability" standard for determining
> probable cause).  While we do not endorse such an
> inference without a factual basis to form the nexus between
> the residence and the drugs, United States v. Tellez, 217
> F.3d 547, 550 (8th Cir.2000)("We agree, of course, that
> there must be evidence of a nexus between the contraband
> and the place to be searched before a warrant may properly
> issue."), we cannot say that it was entirely unreasonable for
> [the officer] to believe that such an inference was
> permissible.  As a matter of common sense, it is logical to
> infer that someone in possession of valuable contraband
> would store that contraband in a safe, accessible location
> such as his or her residence.  Given the common sense

> appeal of this inference, and its acceptance by the issuing
> magistrate, it was not entirely unreasonable for [the officer]
> to believe the inference to be permissible.

Id. at 671-72; see United States v. Riedesel, 987 F.2d 1383, 1390-91 (8th Cir. 1993); United States v. Frazier, 423 F.3d 526, 537 (6th Cir. 2005); see also, United States v. Gibson, 928 F.2d 250, 253 (8th Cir. 1991)("Ordinarily, a police officer cannot be expected to question a judge's probable cause determination.").

Based upon the reasoning of Carpenter, if we were to find less than a conclusive nexus, between the narcotics activity that was described in Nemerow's Affidavit, and the Superior House, such a finding would not compel the exclusion of the evidence that was uncovered during the execution of that Search Warrant.

Nemerow had reason to believe that the Defendant was engaged in the ongoing sale of narcotics, and it was objectively reasonable for him to rely on the determination of the issuing Judicial Officer, that evidence of such activity would be found at the Superior House.  Nemerow also reasonably believed that the Superior House was the Defendant's residence, based on surveillance performed during the investigation. Therefore, we find that the requested suppression of the evidence, with respect to the Search Warrant for the Superior House, would be improper under the good faith exception that was articulated in Leon, and proceed to the question of whether Rule 41 requires suppression.

c.      Rule 41, Federal Rules of Criminal Procedure.

1)      Standard of Review.   Rule 41(b), Federal Rules of

Criminal Procedure, provides, in pertinent part, as follows:

> (b)     Authority to Issue a Warrant.   At the request of a
> federal law enforcement officer or an attorney for the
> government: * * *
>
>> (2)     a magistrate judge with authority in the district
>> has authority to issue a warrant for a person or
>> property outside the district if the person or property
>> is located within the district when the warrant is
>> issued but might move or be moved outside the
>> district before the warrant is executed[.]

"Rule 41 and the Fourth Amendment are not coextensive," and "[n]oncompliance with

[Rule] 41 prerequisites does not automatically require the exclusion of evidence in a

federal prosecution." United States v. Schoenheit, 856 F.2d 74, 76-77 (8th Cir. 1988),

citing United States v. Brown, 584 F.2d 282, 258 (8th Cir. 1978), cert. denied, 440

U.S. 910 (1979).

In determining whether a violation of Rule 41 requires suppression, our Court

of Appeals has adopted the rule set forth in United States v. Burke, 517 F.2d 377, 386-

87 (2nd Cir. 1975), which provides that suppression is proper, only where "(1) 'there

was prejudice in the sense that the search might not have occurred or would not have

been so abrasive if the Rule had been followed,' or (2) 'there is evidence of intentional or deliberate disregard of a provision in the rule.'"  United States v. Burgard, 551 F.2d 190, 193 (8th Cir. 1977), quoting United States v. Burke, supra at 386-87; see, United States v. Bieri, 21 F.3d 811, 816 (8th Cir. 1994), cert. denied, 513 U.S. 878 (1994)("We apply the exclusionary rule to violations of Rule 41 only if a defendant is prejudiced or reckless disregard of proper procedure is evident."), citing United States v. Freeman, 897 F.2d 346, 348-49 (8th Cir. 1990); United States v. Brown, supra at 258; United States v. Schoenheit, supra at 77.  In the absence of such a showing, suppression is inappropriate.

2)     Legal Analysis.  The Search Warrant for the Superior House, which is located in the Western District of Wisconsin, was issued by a Magistrate Judge in this District.  As a general proposition, the jurisdiction of a United States Magistrate Judge is limited to the District in which he or she sits.  See, Title 28 U.S.C. §636; United States v. Strother, 578 F.2d 397, 399 (D.C. Cir. 1978) (citing "[t]he general principle that a judicial officer's writ cannot run outside her territorial jurisdiction[.]"); United States v. Bailey, 193 F. Supp.2d 1044, 1051 (S.D. Ohio 2002)("[A] judicial officer in one district is generally without authority to issue a search warrant for property in another district."); see also, United States v. Comprehensive

- 54 -

Drug Testing, Inc., 473 F.3d 915, 921 n. 9 (9th Cir. 2006)(noting that law enforcement sought search warrants from magistrate judges in both Nevada and California, and that such "pursuit of search warrants in different districts was proper" under Rule 41(b), Federal Rules of Criminal Procedure); United States v. Ramirez, 146 Fed.Appx. 518, 520 (2d Cir. 2005)(in criminal investigation, where Search Warrants were sought for offices in New Jersey, and in New York, Warrants were issued by two (2) different Magistrate Judges in two (2) different jurisdictions).   Rule 41, however, permits a Magistrate Judge to "issue a warrant for a person or property outside the district if the person or property is located within the district when the warrant is issued but might move or be moved outside the district before the warrant is executed[.]"   Rule 41(b)(2), Federal Rules of Criminal Procedure.

The text of the Rule, however, does not support the issuance of the Search Warrant for the Superior House by a Magistrate Judge in this District.  Rule 41(b)(2) was promulgated to authorize "execution of search warrants in another district under limited circumstances."  See, Rule 41, Federal Rules of Criminal Procedure, Advisory Committee's Note, 1990 Amendments (referring to former Rule 41(a)(2), now codified at Rule 41(b)(2)).  As examples of "movable property," as contemplated by Rule 41, the Advisory Committee stated that the amendment would provide a Warrant

procedure to cover "a footlocker carried onto a train," a "beeper [moving] across state lines," or "luggage moving aboard a plane." Id.  In other words, the "movable property" is the property to be searched -- in this case, the Superior House -- and **not** the property to be seized -- here, narcotics and other evidence of criminal activity. Accordingly, Rule 41 did not authorize the Magistrate Judge to issue a Search Warrant for the Superior House, because there was no risk that the house -- i.e., the property to be searched -- "might move or be moved outside the district before the warrant is executed." Rule 41(b)(2), Federal Rules of Criminal Procedure.

In view of the foregoing, it appears that the Search Warrant for the Superior House violated the requirements of Rule 41, as the issuing Magistrate Judge was not authorized to issue, under the circumstances here, a Warrant to be executed on real estate located outside of this District.  Notwithstanding that deficiency in the Warrant, we conclude that suppression of the evidence seized at the Superior House is unnecessary.  According to our research, those cases addressing like or closely similar facts, have rejected the need for suppression.  See, United States v. Cassidy, 532 F. Supp. 613, 617 (D.C.N.C. 1982)("Assuming arguendo that Judge Britt lacked authority to issue the search warrant resulting in a violation of Rule 41 [based on the defendant's argument that the Judge was from another District], the violation

nonetheless does not warrant suppression of the evidence."); <u>United States v.</u> <u>LaFountain</u>, 252 F. Supp.2d 883, 891 (D. N.D. 2003)(denying Motion to Suppress where a Search Warrant was issued by an unauthorized Judge in violation of Rule 41, when there was "no evidence that the search warrants would not have been issued otherwise.").

When faced with a violation of Rule 41, under the law of our Circuit, we first look to whether the violation was fundamental, or nonfundamental, under the analysis identified in <u>United States v. Luk</u>, 859 F.2d 667, 671 (9th Cir. 1988), and adopted by our Court of Appeals in <u>United States v. Freeman</u>, supra at 350, as follows:

> [A] violation is "fundamental" only where it, in effect, renders the search unconstitutional under traditional fourth amendment standards. Violations of Rule 41 which do not arise to constitutional error are classified "non-fundamental."

Here, we find no violation of Rule 41 which rises to constitutional import. As we have detailed, the Warrant was constitutionally sufficient as it was supported by probable cause to believe that a search of the Superior House would result in the discovery of evidence of criminal activity, and the Affidavit established a sufficient nexus, between the Defendant and the residence. Accordingly, any violation of Rule 41 was of a non-fundamental nature, and suppression is not automatically required.

Proceeding to the next step of the analysis -- which focuses on whether the Defendant suffered any prejudice, or whether law enforcement intentionally and deliberately disregarded the Rule, see, United States v. Freeman, supra at 348-49, and United States v. Burgard, supra at 193 -- the Defendant has failed to present any showing of prejudice arising from the violation of the Rule.

Rather, the presence of probable cause for the issuance of the Warrant adequately demonstrates that the same Warrant would have been issued by a Magistrate Judge in the Western District of Wisconsin, if it had been presented for that Judge's review.  See, United States v. Hyten, 5 F.3d 1154, 1157 (8th Cir. 1993) ("Had Deputy Clapp instead of Deputy Wold attested to the affidavit, there is no question the search would have occurred."); see also, Rule 41(d)(1), Federal Rules of Criminal Procedure ("After receiving an affidavit or other information, a magistrate judge * * * must issue the warrant if there is probable cause[.]"); United States v. LaFountain, supra at 891 ("There is no evidence that the search warrants would not have been issued otherwise.").

Moreover, there is not the slightest intimation that the Magistrate Judge, Nemerow, or any other officer, engaged in an intentional or deliberate attempt to circumvent the requirements of Rule 41, or otherwise acted in bad faith.  See, United

States v. Berry, 113 F.3d 121, 123 (8th Cir. 1997)("[B]ecause no evidence exists that the officers acted in bad faith, it follows that there was no reckless disregard of proper procedure."), quoting United States v. Bieri, supra at 816, citing, in turn, United States v. Hyten, supra at 1157 ("[O]ur prior determination that [the officers] acted in good faith precludes any finding of deliberate disregard of proper procedure on their part."). Indeed, if the Defendant knew of any specific basis to attack the issuance of the Warrant in this District, we are confident that the basis would have been particularized at the time of the Hearing, with appropriate factual support and briefing.  In point of fact, our close inquiry, arising from the generic submission of the Motion to Suppress on the "four corners" of the Warrant, and its supporting papers, prompted our exploration of this issue.

In sum, we find no basis to grant the Defendant's Motion, due to any violation of Rule 41, or for any other constitutional defect, and therefore, we recommend that his Motion, insofar as it pertains to the Search Warrant for the Superior House, be denied.

NOW, THEREFORE, It is --

RECOMMENDED:

1.      The Defendant Angelo M. Castleman's Motion to Suppress Evidence Secured in Violation of Fourth Amendment [Docket No. 647] and Motion to Suppress Evidence Security in Violation of Fifth Amendment [Docket No. 648] be denied, as moot.

2.      That Defendant Antwon Bernard Williams' Motion to Suppress Statements, Admissions and Answers [Docket No. 428] be denied, as moot.

3.      That  Defendant Bernard Vann's Motion to Suppress Any Identifications [Docket No. 618] be DENIED.

4.      That Defendant Bernard Vann's Motion to Suppress Any Evidence Obtained as a Result of Any Illegal Searches [Docket No. 621] be DENIED.

Dated:  October 25, 2007                    s/Raymond L. Erickson
                                            Raymond L. Erickson
                                            CHIEF U.S.  MAGISTRATE JUDGE

NOTICE

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than November 9, 2007**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than November 9, 2007**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.